**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| HORSHAM MOBILE STATION CORP., | HONORABLE KAREN M. WILLIAMS |
| *Plaintiff,* | Civil Action |
| v. | No. 25-2571 (KMW-AMD) |
| LUKOIL NORTH AMERICA, LLC, | |
| *Defendant.* | **OPINION** |

**WILLIAMS, District Judge:**

      **THIS MATTER** comes before the Court upon the Emergency Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiff Horsham Mobile Station Corp. ("Plaintiff") (ECF No. 3). Defendant Lukoil North America, LLC ("LNA") opposed the Motion (ECF No. 8), and Plaintiff replied (ECF No. 12). The Court has reviewed the parties' submissions and heard the arguments of counsel during oral argument held on May 13, 2025; and the Court noting the appearances of counsel: Evan Matthew Goldman, Esq., appearing on behalf of Plaintiff; and James Patrick McAndrew, Jr., Esq. and Eman Abouelseoud, Esq., appearing on behalf of Defendant. For the reasons set forth below, Plaintiff's Motion is **DENIED**.

### I.     BACKGROUND

#### a.  The Parties

      Plaintiff has operated a gas station at 496 Easton Road, Horsham, Pennsylvania 19044 (the "Premises") since May 2004, when the Premises was a Mobil-branded gas station. (*See* Verified Complaint ¶ 10, ECF No. 1.) In 2004, LNA purchased a major portfolio of Mobil-branded stations brands, which subsequently became Lukoil-branded stations. (*Id.* ¶ 12.) Plaintiff's franchise was

eventually rebranded as LUKOIL. (*See id.* ¶ 12.) In 2007, Plaintiff executed a franchise agreement with LNA, which subsequently expired. (*See id.* ¶ 13.) Over the course of the twenty-plus years during which Plaintiff has operated at the Premises, additional franchise agreements were executed by and between Plaintiff and LNA. (*See id.* ¶ 14.)

### b. The Operative Franchise Agreement

On or about April 27, 2023, Plaintiff and LNA renewed a three-year Petroleum Marketing Practices Act ("PMPA") Franchise Agreement, with all ancillary agreements (the "Agreement"), which became effective August 1, 2023. (Affidavit of Jake Naggy ("Naggy Aff.") ¶ 10, ECF No. 8-2; *see* Verified Compl. ¶ 16, Ex. A.) Plaintiff's principal, Anil Aggarwal ("Aggarwal"), executed the Agreement on Plaintiff's behalf, and signed a "Key Individual Guaranty," through which he provided a "continuing, unconditional personal guarantee" of Plaintiff's performance under the Franchise Agreement. (ECF No. 8-2 at 133-36.)

Section 9.1 of the Agreement, titled "Importance of Operational Requirements," expressly states that compliance with LNA's standards and procedures is reasonable and materially significant to the franchise relationship, (*id.* at 32), and critically important to LNA, the franchisee, and other Retail Outlets, in order to: (i) "meet customer needs and expectations of excellence"; (ii) "maintain high and uniform operating standards"; (iii) increase customer demand and brand loyalty; and (iv) "protect the reputation and goodwill associated with the Proprietary Marks." (*Id.*)

To meet the foregoing aims, the Agreement expressly required Plaintiff to: (1) operate the Businesses in strict conformity with the methods, procedures, standards and specifications prescribed by LNA, (*id.*); (2) keep the marketing premises open daily from 5:00 a.m. to midnight, in accordance with LNA's Hours of Operation Policy and subject to applicable laws, (*id.*); (3) keep the motor-fuels business open and in normal operation during these required hours, (*id.*); and most

2

importantly, (4) operate and maintain the marketing premises and businesses in compliance with all applicable laws," (*id.* at 32).

The Franchise Agreement not only defines these obligations as material but also clearly sets forth the consequences of failing to adhere to them. Section 14.1, "Termination or Nonrenewal of Agreement and Franchise Relationship," provides that LNA may terminate the Agreement and franchise relationship in accordance with the PMPA, 15 U.S.C. § 2801 *et seq.* (*Id.* at 43.) Furthermore, the Agreement articulates the materiality and importance of each term, condition, and provision contained in the Agreement by maintaining: "FRANCHISE DEALER ACKNOWLEDGES THE SIGNIFICANCE OF EACH TERM AND CONDITION AND THAT ANY BREACH OF THE TERMS AND CONDITIONS IS SUBSTANTIAL." (*Id.* at 49.)

Additionally, "Franchise Dealer has expressly acknowledged in this Agreement that failure to meet certain obligations constitutes a failure to comply with a reasonable and materially significant provision of this Agreement or the Franchise Relationship." (*Id.*)

### c. Notice of Termination of the Franchise Agreement and Plaintiffs' Violations

On March 18, 2025, LNA issued a written notice to Plaintiff, and its other franchisees, reiterating that failure to adhere to these obligations could result in termination of the franchise agreement, and emphasizing that under no circumstances were operators permitted to leave dispensers active while the station was closed and unattended. (Naggy Aff. ¶ 19-20, Ex. B.) LNA asserts that in the days following this notice, Plaintiff violated both the franchise agreement and Pennsylvania law, allowing fuel to be dispensed while the station was closed and unstaffed on multiple occasions. (Affidavit of Michele M. Harris-Woodrow ("Harris Aff.") ¶ 5-10, ECF No. 8-1.)

LNA assigned investigator Charles Harris to monitor Plaintiff for compliance with its contractual obligations—particularly the requirement to maintain the designated hours of operation—by observing Plaintiff's station over six separate days in March 2025. (Naggy Aff. ¶ 18; Harris Aff. ¶ 4.) Harris recorded field notes, took photographs, and submitted an affidavit detailing his observations, which LNA submitted in support of its opposition in response to this Court's Order to Show Cause. (*See* Harris Aff. ¶ 4, Exs. A-F.)

On March 20, 2025, Harris arrived on site at approximately 4:49 a.m. (*Id.* ¶ 5.) The gas pump lights were off. The lights in the building were on, but the location was closed for business. At approximately 5:45 a.m., a male entered the building and appeared to stock shelves, but the gas pump lights remained off. Harris returned to the location at approximately 11:28 p.m. and observed that the lights in the store were on but it was closed for business, which he confirmed by testing the door and confirming it was locked. (*Id.* ¶ 5, Ex. A.)

On March 21, 2025, Harris arrived on site at approximately 11:11 p.m. and observed that the store was closed. (*Id.* ¶ 6, Ex. B.) On March 22, 2025, Harris arrived at the station at approximately 4:39 a.m. (*Id.* ¶ 7.) The store was closed. Harris observed the store open at approximately 6:59 a.m. Harris returned to the station at approximately 10:50 p.m. and observed that the store was closed. (*Id.*) Harris spoke to a local police officer that night who told him that the station regularly closes between 9 and 10 p.m. most nights. (*Id.*) That night, Harris was able to pump $10 worth of gas while the store was closed and the lights for the pumps and gas island were off. (*Id.* ¶ 7, Ex. C.)

On March 23, 2025, Harris arrived on site at 5:04 a.m. (*Id.* ¶ 8.) The store was closed. At 6:36 a.m., a male arrived and began pumping fuel from pump number one. (*Id.*) The man attempted to enter the building but was unable to because the building was locked, and the station was still

closed. (*Id.*) At 6:42 a.m., another person arrived and pumped gas. He attempted to enter the building, but it was still locked and closed. (*Id.*) At approximately 6:58 a.m. the store was unlocked and opened for business. Harris returned to the location at approximately 10:05 p.m. and the store was closed. (*Id.* ¶ 8, Ex. D.)

On March 24, 2025, Harris arrived on site at 4:51 a.m. (*Id.* ¶ 9.) The store was closed. At 6:16 a.m., the store opened. (*Id.*) Harris returned at 9:50 p.m. At approximately 10 p.m., a man was seen closing the store, locking the doors, and leaving in his car. (*Id.*) At 10:08 p.m., Harris pumped $13.00 worth of gas from pump seven while the store was closed. (*Id.* ¶ 9, Ex. E.) Harris took photographs of the station and his gas receipts corroborating his foregoing observations, which are attached to his declaration. Notably, Harris never witnessed Plaintiff's station comply with its contractual hours of operation during the six-day surveillance period. (*Id.*)

On March 28, 2025, LNA issued a Termination Letter notifying Plaintiff of the immediate termination of the franchise relationship effective April 11, 2025 at noon. (Naggy Aff. ¶¶ 20-23, Ex. C; *see* Verified Compl. ¶ 26.) The Termination Letter stated that the termination was based on Plaintiff's repeated and willful violations of the PMPA Agreement and applicable state law, including unauthorized dispensing of fuel in direct violation of 35 Pa. Stat. § 1244(d)(1), and ongoing noncompliance with the contractual hours of operation. (*Id.*; *see* Verified Compl. ¶ 29.) Plaintiff's Complaint acknowledges the statute at issue but does not concede that the allegations are true, and further alleges that "nobody was harmed" as a result. (Verified Compl. ¶ 30.)

On April 9, 2025, two days before the scheduled termination, Plaintiff filed the instant action. (Verified Compl.) This Court entered an *ex parte* TRO the following day enjoining LNA from proceeding with the termination pending further proceedings and scheduled a hearing for May 1, 2025, following briefing from the parties. (ECF No. 6.)

## II.    LEGAL STANDARD

### a.    Preliminary Injunction Standard Pursuant to the PMPA, 15 U.S.C. § 2801 *et seq.*

The PMPA was enacted "in recognition of the 'disparity of bargaining power which exists between the franchisor and the franchisee' in the gasoline industry." *Rodgers v. Sun Refining & Mktg. Co.*, 772 F.2d 1154, 1158 (3d Cir. 1985) (quoting *Sun Refining & Mktg. Co. v. Rago*, 741 F.2d 670, 672 (3d Cir. 1984)). In enacting the PMPA, the legislature acknowledged that if franchise agreements are unfairly or arbitrarily terminated or not renewed, franchisees could lose their livelihood and that franchisors tend to use "their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes." *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 587 (3d Cir. 1989). Accordingly, the PMPA was enacted to protect franchisees from exploitation by large petroleum companies.

The parties agree that the PMPA authorizes courts to issue a preliminary injunction while a termination dispute is litigated. (LNA's Opp. Br. at 11, ECF No. 8; Pl.'s Br. at 9-10, ECF No. 3-1 (citing *Marini v. Atl. Richfield Co.*, 475 F. Supp. 142, 143 (D.N.J. 1979)); *see also* 15 U.S.C. § 2805(b)(2).) To obtain injunctive relief under the PMPA, a franchisee must show:  (1) the franchise has been terminated; (2) there exists sufficiently serious questions to the merits to make such questions a fair ground for litigation; and (3) on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted. 15 U.S.C. §§ 2805(b)(1) and (2); *see Marini*, 475 F. Supp. at 143.

The Third Circuit has acknowledged that the Act allows "franchisees to obtain a preliminary injunction upon a lesser showing than is usually required." *Sun Refining*, 741 F.2d at 672; *see also Brownstein v. Arco Petroleum Products Co.*, 604 F. Supp. 312, 314 (E.D. Pa. 1985) (same). This is

consistent with Congress's understanding that "petroleum franchisees risk losing completely the return from prior investments, and potentially their livelihood, if their franchise agreements are terminated." *O'Shea*, 886 F. 2d at 588.

### III.    DISCUSSION
#### a.    First Element – Plaintiff has Established a Termination of the Franchise Pursuant to the PMPA

The U.S. Supreme Court has held that preliminary injunctive relief is available to franchisees even if the date of termination given in the notice of termination has not yet come to pass. "A franchisee that receives notice of termination 'has been terminated' within the meaning of § 2805(b)(2)(A)(i), even though the termination 'takes effect' on a later date, just as an employee who receives notice of discharge can be accurately described as having been discharged, even though the employee's last day at work may perhaps be weeks later." *Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC*, 559 U.S. 175, 189 (2010). "Thus, franchisees that receive notice of impending termination can invoke the protections of the Act's preliminary injunction mechanism well before having to go out of business." *Id.*

Here, Plaintiff satisfied the first element to obtain injunctive relief under the PMPA—that "the franchise has been terminated" pursuant to 15 U.S.C. § 2805(b)(1)—when LNA provided notice of termination on March 28, 2025. *See Mac's Shell Serv., Inc.*, 559 U.S. at 189. LNA does not dispute that the first statutory factor for injunctive relief under the PMPA is satisfied, but for the reasons that follow, Plaintiff's claims faulter under the remaining prongs.

b. **Second Element – Whether There Is a Serious Question Going to The Merits Concerning LNA's Compliance with The PMPA's Termination Procedures for Terminating Franchise Agreement and Notice Requirement**

i. *The PMPA's Termination Procedures*

The PMPA limits the circumstances under which a franchisor may terminate a franchise. *Mac's Shell Serv., Inc.*, 559 U.S. at 176. For "legitimate needs," a franchisor can terminate the franchise based upon one of the enumerated grounds set forth in the PMPA. *Sun Refining and Marketing Co.*, 741 F.2d at 741. Thus, a franchisor must comply with the substantive and procedural requirements of the PMPA to lawfully terminate a franchise relationship. 15 U.S.C. § 2802. 15 U.S.C. § 2804(a), titled "General requirements applicable to franchisor," provides:

> Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship--
>
> (1) in the manner described in subsection (c); and
>
> (2) except as provided in subsection (b), not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

15 U.S.C. § 2804(b), titled "Additional requirements applicable to franchisor," further states:

> (1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2)--
>
> (A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable;
>
> . . . .

8

In other words, 15 U.S.C. § 2804 states that notice is to be provided 90 days before the termination, or less than 90 days only in circumstances where not reasonably practicable. This is further subject to 15 U.S.C. § 2802, which provides:

**(b) Precondition and grounds for termination or nonrenewal**

(1) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if--

    (A) **the notification requirements of section 2804 of this title are met**; and . . . .

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

    (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, **if the franchisor first acquired actual or constructive knowledge of such failure**--

        (i) . . . .

        (ii) not more than 90 days prior to the date on which notification of termination or nonrenewal is given, **if less than 90 days notification is given pursuant to section 2804(b)(1) of this title**.

    . . . .

    (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the **franchisor first acquired actual or constructive knowledge of such occurrence**--

        (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

        (ii) **not more than 60 days prior to the date on which notification of termination or nonrenewal**

**is given**, if less than 90 days notification is given
pursuant to section 2804(b)(1) of this title.

15 U.S.C. § 2802 (emphasis added).

In other words, 15 U.S.C. § 2802(b)(2)(A)(ii) and (C)(ii) provide that a franchisor, here

LNA, is allowed to terminate the franchise agreement with less than 90 days-notice if such notice

is not practicable and the franchisor learned about the event that violated the franchise agreement

within the 60 days before the notice of termination.

>    *ii.  Plaintiff's Request for A Preliminary Injunction Is Denied and The
>    Temporary Restraints Are Dissolved Because Plaintiff Has Failed to
>    Establish That LNA Violated the Applicable OMPA Procedures
>    Regarding Termination and Notice*

The parties agree that where, as here, the franchisor provides less than 90 days' notice of

termination, the Act requires that the franchisors have known of the grounds for termination for

no more than 60 days. 15 U.S.C. § 2802(b)(2)(A)(ii), (C)(ii).

Here, it is undisputed that LNA provided notice of termination on March 28, 2025, less

than 90 days before its effective date of April 11, 2025. The question then is whether LNA first

acquired knowledge of the material breaches of the franchise agreement giving rise to the notice

of termination less than 60 days before issuing it, which would allow LNA to terminate on less

than 90-days' notice. For the reasons that follow, the Court finds that Plaintiff has not demonstrated

that LNA first acquired such knowledge more than 60 days before the notice. Indeed, LNA offers

credible evidence that it first acquired knowledge of the material breaches less than 60 days before

the termination. LNA has submitted robust evidence that from March 20-26, it discovered that

Plaintiff's pumps remained active after the station was closed. LNA submits not only Harris' field

notes and affidavit, but also time-stamped photos of these violations. (*See* Harris Aff., Exs. A-F.)

Plaintiff does not dispute that permitting gasoline to be dispensed without an attendant present is against Pennsylvania law, in violation of 35 Pa. Stat. § 1244(d)(1). (Verified Compl. ¶ 30.)

The express terms of the Franchise Agreement provide that violations of applicable law are deemed material for purposes of the agreement and can result in the termination that ultimately issued. (*See* Naggy Aff., Ex. A, ECF No. 8-2 at 154.) The fact that LNA learned Plaintiff was unlawfully permitting fuel to be dispensed without an attendant present less than 60 days before it gave notice is sufficient grounds for LNA to terminate the agreement with less than 90-days' notice, regardless of the issue concerning Plaintiff's hours of operations. *See* 15 U.S.C. § 2802(b)(2)(C)(ii).

Plaintiff makes the conclusory allegation that LNA had knowledge of these offenses before the investigation, but the only evidence that Plaintiff points to suggesting LNA suspected Plaintiff of allowing gas to be pumped without an attendant present is its March 18 letter, which was well within the 60-day period contemplated by the PMPA. (Naggy Aff., Ex B.) Rather, Plaintiff argues that the cited reasons for the termination—permitting fuel to be dispensed without an attendant present and failing to operate during the hours stated in the Agreement—are pretextual because LNA listed the Premises as available for leasing on October 14, 2024, more than 60-days before the notice of termination. (Pl.'s Br. at 6-7, ECF No. 3-1.) Plaintiff also argues that LNA's bidding constituted an anticipatory breach of the Franchise Agreement which itself violated the PMPA. (Pl.'s Reply at 7-9.) Even if the foregoing assertions were true, they do not appear relevant to the instant issue before the Court of when LNA first knew of the specific violations cited in their March 18 and 28 letters as grounds for the notice of termination. Ultimately, if Plaintiff had complied with Pennsylvania law and the terms of the Franchise Agreement at all relevant times, LNA would not have been able to present the credible evidence of those violations to the Court,

which supports LNA's notice of termination. The Franchise Agreement is also clear that the failure to operate during the required hours is material and may result in termination.

Plaintiff argues that it was entitled to the opportunity to remedy any material breaches, but the Harris Affidavit and attached photographs clearly show that after Plaintiff was provided notice of the violation on March 18, it failed to remedy the material breach regarding its hours of operation and continued to violate the terms of the Agreement concerning those hours. This too entitled LNA to terminate the agreement on less than 90 days' notice. (*See* Naggy Aff. ¶ 19-20, Ex. B).

Plaintiff submitted with its Reply the Declaration of Anil Aggarwal ("Aggarwal Decl."), ECF No. 12-1, which asserts that the March 18 letter was not received until March 20 and that the letter was sent *en masse* to several LNA franchisees. (Aggarwal Decl. ¶ 18-19.) First, Plaintiff does not deny that it received the letter or dispute its contents, which clearly provides notice that failure to operate by contractual hours will be enforced by "all means available, up to and including termination of the [A]greement." (Naggy Aff., Ex. B.) Second, whether Plaintiff received the letter on March 18 or March 20 does not change that the alleged violations were observed by Harris over the course of the following week and thus Plaintiff failed to remedy the issue.

Plaintiff asserts that the main doors of the premises are often locked from 5-6 a.m. and 10 p.m. to midnight for safety reasons, during which time customers are still served through a window. (Aggarwal Decl. ¶ 25.) But Plaintiff's bare assertions do not address the well-documented observations by Harris that:

- On March 22, 2025, Harris arrived at the store at from 4:39 a.m. and observed that it was closed until he observed an employee open the store at 6:59 a.m. (Harris Aff. ¶ 7.)

12

- On March 23, 2025, Harris arrived on site at 5:04 a.m. and observed someone unlock and open the store for business at 6:58 a.m. (*Id.* ¶ 8.)

- On March 24, 2025, Harris arrived at 4:51 a.m. and observed the store open at 6:16 a.m. That night, Harris also observed a man close the store, lock the doors, and leave in his car at 9:50 p.m. (*Id.* ¶ 9.)

These specific observations support LNA's contention that Plaintiff violated the terms of the Agreement by failing to operate within the required hours. Moreover, nothing in the Aggarwal Declaration addresses that Plaintiff permitted fuel to be dispensed on March 23 and 24 while the store was closed and before employees were observed first arriving to the store to open it on those days. (*Id.* ¶¶ 8-9.) Plaintiff also offers no evidence to suggest that LNA knew before March 18 (the date of LNA's letter first suggesting it knew Plaintiff was not operating at the required hours) that Plaintiff was in breach of the Agreement.

Accordingly, the Court finds that Plaintiff has failed to establish the second requirement for a preliminary injunction pursuant to the PMPA, that there exist sufficiently serious questions to the merits to make such questions a fair ground for litigation. 15 U.S.C. § 2805(b)(2); *see Marini*, 475 F. Supp. at 143.

### c. Third Element – The Balance of Hardships Weighs in Favor of Denying Plaintiff's Request for a Preliminary Injunction and Dissolving the TRO

While the foregoing reasons are sufficient to deny Plaintiff's application, the Court further finds that in light of the foregoing, the balance of hardships also favors denying the preliminary injunction. *See id.* If a preliminary injunction is not granted, an LNA-branded station will remain in violation of Pennsylvania law. That law exists to prevent combustible or flammable fuel from being spilled by consumers outside the presence of an attendant to protect the health and safety of the general public. *See* 35 P.S. § 1244. LNA will also continue to suffer what the express terms of the Franchise Agreement deem are material breaches. (*See* Naggy Aff., Ex. A, ECF No. 8-2 at 31-

32.) Conversely, any hardship posed on Plaintiff will not be undue because Plaintiff's documented non-compliance with applicable laws and the terms of the Franchise Agreement, by its very terms, entitle LNA to terminate the Agreement. (*Id.* at 49.)

For all the foregoing reasons, Plaintiff's application for a preliminary injunction is denied and the Court's temporary restraints on LNA (ECF No. 6) are hereby dissolved.[1]

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff's Emergency Motion for Preliminary Injunction (ECF No. 3) is **DENIED**.

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

[1] Plaintiff also suggests in its Reply that LNA flagrantly disregarded this Court's TRO by putting a hold on its credit card, but nothing in this Court's TRO prohibited LNA from taking such an action. (Pl.'s Reply at 3; *see* Aggarwal Decl. ¶ 25, ECF No. 12-1.) Moreover, LNA has attested that the hold was inadvertent and rectified immediately upon discovery. (LNA's Sur-Reply to Aggarwal Decl. ¶ 25, ECF No. 1.)